UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ANDREW R.,[1]

                          Plaintiff                    DECISION and ORDER

-vs-
                                                      1:21-CV-00102 CJS
COMMISSIONER OF SOCIAL
SECURITY,

                          Defendant.
_____

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant") which denied the application of Plaintiff for Social Security Disability Insurance ("SSDI") benefits and Supplemental Security Income ("SSI") benefits.   Now before the Court is Plaintiff's motion (ECF No.7) for judgment on the pleadings and Defendant's cross-motion (ECF No. 8) for the same relief.   For the reasons discussed below, Plaintiff's application is denied, and Defendant's application is granted.

## STANDARDS OF LAW

The Commissioner decides applications for disability benefits using a five-step sequential evaluation process:

---

[1]  The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

1

A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].   Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[2] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform. The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.[3]

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted).

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   Further, Section 405(g) states, in relevant

---

[2] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

[3] "The Commissioner's burden at step five is to show the existence of possible employment for an individual with the RFC determined by the ALJ in the fourth step of the sequential analysis." *Smith v. Berryhill*, 740 F. App'x 721, 726–27 (2d Cir. 2018) (citation omitted). The ALJ typically does this either by resorting to the medical vocational "grids" or, where the claimant has a non-exertional impairment, by taking testimony from a vocational expert. *See, Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986) ("[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines. A more appropriate approach is that when a claimant's nonexertional impairments significantly diminish his ability to work—over and above any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the medical vocational guidelines, then the Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.").

part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the [administrative law judge] [("]ALJ[)"]. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773.   Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude

3

> otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).   "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted).

## FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action, which are set forth in the parties' papers.   The Court will refer to the record only as necessary to rule on the alleged errors identified by Plaintiff.

Plaintiff has some minor non-severe physical ailments, but primarily claims that he cannot work because his severe cognitive impairments prevent him from maintaining regular employment without accommodations such as job coaching.

While in tenth grade Plaintiff's cognitive abilities and overall achievement were assessed as being in the very low- or extremely low range, and his abilities for verbal and nonverbal reasoning, working memory and processing speed were in the borderline range. Plaintiff received special education classes in high school and attended BOCES in the auto body repair program. Plaintiff graduated from high school at age 19, in 2013, with an individualized education plan "IEP" diploma.

Plaintiff's high school "Student Exit Summary" purported to summarize his relative strengths and weaknesses, and stated in pertinent part:

> You have participated in vocational training at BOCES in the auto body program. You have worked hard to achieve passing grades in your academic classes. Your homework was always completed and you gave good effort in all of your classroom work. You have been observed to have a difficult time recalling material, but have worked hard and your test scores on class work are fair. You continue to work on writing skills to develop paragraphs. You are also working on comprehension when reading.
>
> When you were last assessed in tenth grade, your overall cognitive abilities fell in the extremely low range. This means that it may be more difficult for you to understand information than others of your same age. Your working memory and processing speed were also in the borderline range. That means that you may need additional reminders or to use external memory aid such as lists and calendars to remember all the tasks you have to accomplish. You may also need some additional time to complete tasks. When approaching an employer, you may need to explain that you need additional time to understand new assignments/tasks but you are capable of learning them with additional examples and practice time. Your overall achievement as assessed in 2010 was in the very low range. Reading, math and written language skills were all in the very low

range.   Areas of relative strength were in your ability to decode words, understand mathematical concepts, and write sentences, which were all in the borderline range.   Math calculations are your area of greatest weakness.   You are encouraged to utilize a calculator when completing computations for daily living skills such as balancing your checkbook.

Andrew, despite your learning challenges in the academic environment, you have demonstrated a wonderful work ethic and great attitude towards school and your responsibilities.   Employers would be pleased with the attitude you have toward your responsibilities.

Needs—Andrew, you need significant assistance in understanding new concepts and tasks in an educational setting, but you are capable of learning them with sufficient practice and work hard to achieve all of your goals.   You will need to access assistance if work responsibilities required reading or written expression. Having manuals read to you and explained with hands-on learning experiences will help you to best learn the task.   You also need to utilize a calculator when completing math calculations.   You need to have multiple steps broken down into two to three part instructions and given lists or visual examples of the steps to be taken to make sure you have achieved all of the parts of a task.

***

You will need to continue to follow up with VESID and outside agency resources to obtain a job coach situation to help build your skills in an area of interest such as auto body repair.

Tr. 369–370.

Plaintiff subsequently worked at various jobs for periods of time, both with and without job coaching. [4]   Generally, Plaintiff indicated that he left those jobs not because his mental impairments prevented him from understanding or performing the actual work, but because he missed too much time from work due to problems such as oversleeping or having an upset stomach. Regarding his poor work attendance, Plaintiff wrote: "When I get a job I often have

---

[4]  For example, there is no indication that Plaintiff's work at the bowling alley involved a job coach.

trouble keeping it because of my attendance.   I sometimes don't hear my alarm or miss work because I am not feeling well." (Tr. 487).

For example, Plaintiff worked at Home Depot unloading trucks and stocking merchandise. Plaintiff left that job after he was hospitalized with strep throat. (Tr. 47).   Plaintiff also worked at a farm unloading trucks and stacking pallets, but eventually left due to poor attendance. (Tr. 47).

Plaintiff also worked in a "sheltered workshop" arrangement, packing beer into boxes.   At this job, Plaintiff had a job coach who would meet with him about once per week. (Tr. 39). Plaintiff left that job after calling in sick too often for having an upset stomach. (Tr. 50).[5]

Plaintiff's longest period of employment appears to have been a two-year stint at Walmart, where he collected and returning shopping carts from the parking lot. (Tr. 43).[6]   Plaintiff obtained the job by himself, and performed the same duties as other employees, though he did have a job coach who met with him about once per week.   Plaintiff was eventually fired from that job after calling in sick too often for having stomach aches. (Tr. 45, 50).

The job coaching that Plaintiff received at most of his employment was evidently provided by The Resource Center, an agency providing counseling and services to persons with disabilities.   The job coaching records indicate that the "coaching plan" called for the job coach to address Plaintiff's "excessive absenteeism/poor attendance" by offering "verbal cues, prompts, directives, and/or encouragement so that Andrew regularly attends his scheduled shifts.   Staff will ensure that Andrew understands that he needs to offer his supervisor advanced

---

[5] *See*, Hr'g Tr. at pp. 42–43 ("Q. Okay.   All right. Why did you stop working at the brewery?   A. My attendance. Q. What was wrong with your attendance?   A. I was coming in late, calling out sick and stuff.   I get sick real easily.   Q. Well, kind of what like sickness were you getting? Like what was happening to have you call in?   A. Upset stomach pretty much mostly.").
[6] Plaintiff was employed at Walmart between 2014 and 2016. (Tr. 268).

notice when he needs to take time off, to discuss the accrual of points, and the possible consequences of having poor attendance." (Tr. 505).   The job coaching records further indicate that the coach reminded Plaintiff at various times about the importance of punctuality and attending work, and that Plaintiff indicated he understood. (Tr. 508, 513, 514, 516).

On or about June 12, 2018, Plaintiff sought services from Aspire, an agency that helps persons with developmental disabilities.   As part of an Individual Service Plan ("ISP") generated for Plaintiff, Aspire's Medicaid Service Coordinator Bradley Heil, ("Heil") purported to summarize Plaintiff's situation as follows:

> Andrew [R.] is a friendly 24 year old young man who lives in his own apartment at 216 W. Everett Street, Falconer, NY.   Andrew has two young sons . . . with his girlfriend[.]
> 
> ***
> 
> Andrew is able to complete self care and daily living skills independently.   He is able to cook simple meals for himself but would like to learn to cook on the grill and . . . follow recipes.   He does need verbal prompting when shopping for simple healthy meals.   He needs support managing his money which his mother helps him with.   Andrew began receiving rental assistance in January 2017 through [The Resource Center ("]TRC[")] and he has stated it has helped him immensely. Andrew's grandmother is also very supportive to Andrew and his family.   In April of 2018 Andrew utilized ISS funding through TRC to help him with the down payment on his own apartment and to help furnish it.
> 
> Andrew is currently working at Allied Industries where they are packaging beer for the Southern Tier Brewery.   Andrew currently receives job coaching services provided by The Resource Center through ACCESS-VR.   His average work week is 20-30 hours/week.   Andrew states he likes working at TRC but would be interested in another line of work that would better help him support his children. Andrew has expressed interest in becoming waiver enrolled to help with greater options for his career.

Andrew is a registered voter.   Andrew has a learning disability [in] which he processes information very slowly and has difficulty retaining information.   He has borderline intellectual disability.

Andrew is allergic to latex and has environmental allergies.   He takes medication (Zyrtec) every night for his allergy and a mild dose of Zoloft for his depressive tendencies.   No other allergies or sensitivities noted.

He has Medicaid and has applied for SSI.   Andrew's SSI case is currently under appeal and being handled by a local attorney in Jamestown NY.   Due to the fact that Andrew is able to find work in a competitive setting with no accommodations the viability of his case is not good.

(Tr. 748).

After an earlier application for Social Security benefits was denied, Plaintiff on October 16, 2018, filed applications for SSDI benefits and SSI benefits, with an alleged disability onset date of July 15, 2018. (Tr. 37).

In connection with Plaintiff's application for SSDI benefits and SSI benefits, on January 9, 2019, psychologist Susan Santarpia, Ph.D. ("Santarpia") conducted a psychiatric evaluation of Plaintiff at the Commissioner's request. (TR. 613-617).   After examining Plaintiff, Santarpia reported that his attention and concentration were mildly impaired, he memory skills were intact, his cognitive functioning was in the low average range, and his insight and judgment were fair. (Tr. 615).   Santaria's medical source statement indicated:

He presents as able to understand, remember, and apply simple directions and instructions, use reason and judgment to make work-related decisions, interact adequately with supervisors, co-workers, and the public, sustain an ordinary routine and regular attendance at work, regulate emotions, control behavior, and maintain well-being, maintain personal hygiene, and be aware of normal hazards and take appropriate precautions within normal limits.   Mild impairment is demonstrated in understanding, remembering and applying complex directions and instructions.   Difficulties are caused by lack of treatment for [attention deficit

9

hyperactivity disorder] ADHD.[7]

Tr. 616.

On January 29, 2019, Plaintiff's primary care provider, Tammy Thayer, NP ("Thayer") remarked concerning the results of a recent psychological examination of Plaintiff, which had been obtained to evaluate Plaintiff for attention deficit disorder ("ADD"), after his mother indicated that "he had been missing work frequently, [and having] trouble with relationships, and lack of motivation." (Tr. 741).   According to Thayer,

> [t]est results reveal a low IQ with low to average results on short term attention and significant deficit with maintaining long term attention.   We discussed recommendations of using calendars for recall of appointments, lists for tasks to be done, and the need to get up in the morning and be productive.   Not sleep all day.   We also discussed that he should look for work doing things that he enjoys.

(Tr. 739).

On February 1, 2019, in connection with the initial denial of Plaintiff's SSDI and SSI applications, agency review psychologist T. Bruni, Ph.D. ("Bruni") completed a report indicating that Plaintiff had, among other things, a "moderate" limitation on his ability to "concentrate, persist, or maintain pace," his ability to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," and his ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 84, 88-89).   Bruni opined, though, that Plaintiff nevertheless "retain[ed] the ability to perform simple tasks in a competitive work environment." (Tr. 85).

---

[7]  Subsequent to Santarpia's examination, Plaintiff began taking medication for ADHD, although, as of the date of the administrative hearing, he had stopped taking the medication due to the side effects. (Tr. 53).

On May 16, 2019, in connection with the denial-upon-reconsideration of Plaintiff's applications, agency review physician H. Tzetzo, M.D. ("Tzetzo") also found, similar to Bruni, that Plaintiff had a "moderate" limitations in the following areas: His ability to "concentrate, persist, or maintain pace;" his ability to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;" and his ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 117–118).   Tzetzo opined, though, that Plaintiff was "not disabled" and "retain[ed] the ability to perform simple tasks in a competitive work environment." (Tr. 114, 119).

On May 29, 2020, after Plaintiff's claim was denied initially, an ALJ conducted a hearing, at which Plaintiff appeared with a non-attorney representative.   The ALJ took testimony from Plaintiff and a vocational expert ("VE").

As of the date of the hearing Plaintiff was 26 years of age, lived alone in an apartment, and had two children who spent every other weekend with him, though he also saw the children "pretty much every day." (Tr. 46).   Plaintiff had a driver's license[8] and took care of his own personal care, shopping, meal preparation and household cleaning.   Plaintiff had a "life coach" who checked on him once per week. (Tr. 52).   Plaintiff indicated that his hobbies were bowling[9] and going to the auto race track.   Plaintiff indicated that he had recently stopped working part-

---

[8]  Plaintiff indicated that he got his learner's permit after taking the written test three times, and did not need anyone to read the test to him. (Tr. 51).

[9]  The record indicates that Plaintiff is very accomplished at bowling, a sport that requires a high level of focus and concentration.   Upon graduating from high school, it was noted that Plaintiff was the school's "top bowler." (Tr. 371).   Regarding his ability as a bowler, Plaintiff later wrote: "I enjoy bowling and am an excellent bowler.   I have bowled five perfect 300 games.   I have also bowled a 296 two 299 games.   I belong to a bowling league at The Jamestown Bowling Company.   I spend a lot of time practicing there also." Tr. 487.

time at a local bowling alley due to the Covid-19 lockdown.   Plaintiff stated that prior to that he had been working at the bowling alley "a couple of days out of the week," for approximately 20 hours per week, working on the pin-setting machines and interacting with customers at the counter. (Tr. 38–39).   Plaintiff did not have a job coach at the bowling alley. (Tr. 46).   Plaintiff indicated that he intended to return to work at the bowling alley once the Covid restrictions were lifted. (Tr. 39).

The VE testified, in pertinent part, that a hypothetical claimant of Plaintiff's same age, experience and education, who was able to work at all exertional levels and who could understand, remember and carry out simple work, adapt to routine workplace changes and occasionally interact with supervisors, co-workers and the public, could perform Plaintiff's past job as a supermarket parking lot cart attendant. (Tr. 55–56). The VE indicated, though, that such a claimant would be fired if he was off task more than ten percent of the time or missed two days or more of work per month.

Plaintiff's representative then asked the VE how his answer might change if the hypothetical claimant needed additional supervision to remain on task:

Q. And if this individual needed to beyond normal supervision to be checked on maybe three extra times during the workday by the supervisors to be sure he was doing the job correctly, or he wasn't off task, needing redirection.[10]   Would that be a reasonable accommodation found in the workplace?

A. It depends upon the frequency and duration of that.   For example, ten percent in a typical eight-hour day, ten percent would be six minutes per hour or 48 minutes total.   So if these redirections were 40 minutes or less, they certainly would fall in – I mean certain people need some extra supervis[ion].   However, I should note

---

[10]  The basis for this question is unclear since the Court is not aware of any evidence in the record indicating that Plaintiff actually needed to be re-directed by a supervisor three times per day.   Rather, Plaintiff testified that when he had a job coach at a particular job, he would typically meet with the job coach once per week.

> that this is a combined off task so this would be – so you could take that in half and it would be 24 to be more accurate because not only is the individual being off task, but now the supervisor is being off task.   So in that scenario, if the supervisor needs to talk to the work and it's more than 24 minutes in a typical day, they would say it's not worth it, we'll go get somebody else.   You know, you're taking a supervisor off task and the person is off task.   So this is basically – if it was kind of like two minutes maybe twice a day, that's going to be more normal.   Everybody kind of might need that, particularly with an SVP 2 employee.   But if you're looking at 24 minutes or more, it's too excessive.   They're not going to be able to sustain a job.   Now, that could be made up with a job coach where the job coach could be coming in.   But now you're talking about sheltered employment.   This is not competitive full-time employment.

(Tr. 57–58).   In other words, the VE testified that the hypothetical claimant could perform Plaintiff's past work even assuming that he needed to be "checked on maybe three extra times during the workday by the supervisors to be sure he was doing the job correctly," provided that such interactions combined did not take more than 24 minutes per shift.   Further, the VE indicated that if an employer brought in a job coach because an employee was requiring more than 24 minutes per day of redirection, then such employment would be considered sheltered employment rather than competitive full-time employment.

On June 29, 2020, the ALJ issued a decision finding that Plaintiff was not disabled at any time between the SSDI and SSI application dates and the date of the decision. Tr. 15–27.   The ALJ applied the five-step sequential evaluation and found, in pertinent part, that Plaintiff had severe impairments consisting of "reading & intellectual disability, cognitive disability, auditory processing disorder, depression/dysthymic disorder, and attention deficit hyperactivity disorder (ADHD)." (Tr. 18).

The ALJ also found, at the third step of the sequential evaluation, that none of Plaintiff's severe impairments met or medically-equaled a listed impairment.   As part of that discussion, the ALJ referenced, on four separate occasions, evidence from Plaintiff's job coach, Exhibit B19E. (Tr. 19–20).   The ALJ noted, for example, that the job coach, who reportedly met with Plaintiff "on a weekly basis during the relevant period," "consistently noted that the claimant was able to get the hang of tasks assigned him and perform his work without difficulty." (Tr. 19-20).

Prior to reaching the fourth step of the sequential evaluation, the ALJ found that Plaintiff had the RFC to perform work at all exertional levels with the following non-exertional limitations: "can understand, remember and carry out simple work, adapt to routine workplace changes, and occasionally interact with supervisors, coworkers and the general public." (Tr. 22).   At the fourth step, the ALJ found that with such RFC Plaintiff could perform his past work as a parking lot attendant and therefore was not disabled.[11]

Plaintiff subsequently commenced the instant action, alleging that the Commissioner's decision must be reversed since it contains errors of law and is unsupported by substantial evidence.   Specifically, as discussed more fully below, Plaintiff makes the following arguments: 1) the ALJ erred by failing to include the moderate limitations referred to by Drs. Bruni and Tzetzo, concerning Plaintiff's ability to maintain a regular schedule, in the RFC finding; and 2) the ALJ failed to develop the record concerning "conflicts" about the degree to which Plaintiff needed help from a job coach and the possibility that Plaintiff's work at Walmart may have been sheltered employment.[12]

---

[11]  Plaintiff appealed, but the Appeals Council declined to review the ALJ's decision, making the ALJ's ruling the Commissioner's final decision.

[12]  The appeal to the Appeals Council was filed and briefed by the same non-attorney representative who

Defendant disputes Plaintiff's arguments and maintains that the ALJ's decision is free of reversible legal error and supported by substantial evidence.

The Court has carefully reviewed and considered the parties' submissions.

DISCUSSION

The ALJ's Alleged Failure to Include Limitations in the RFC

Plaintiff's argument on this point asserts that Drs. Bruni and Tzetzo gave medical opinions in which they referred to Plaintiff having certain moderate limitations with regard to maintaining a regular schedule/regular attendance, and that the ALJ not only found those opinions generally persuasive, but he also made similar findings of moderate limitations in those areas.   Plaintiff maintains, however, that the ALJ erred by failing to either include those specific moderate limitations in the RFC or to explain why he did not include them, and that remand is therefore required.

Defendant responds that the RFC finding is consistent with Plaintiff's limitations and supported by substantial evidence.   Indeed, Defendant asserts that the RFC finding is consistent with all the medical opinion evidence, referring to the opinions of Drs. Bruni, Tzetzo and Santarpia.   Defendant points out that Bruni and Tzetzo expressly indicated that Plaintiff was capable of competitive full-time employment involving simple tasks despite his limitations. *See, e.g.*, Tr. 85 (Bruni opinion: "Claimant's mental impairment is moderate but he retains the

_____

appeared at the hearing before the ALJ. (Tr. 234–235).   The appeal did not allege that the ALJ failed to develop the record in any way, nor did it assert that there were any records concerning Plaintiff's job coach that were missing from the record.   In other words, the argument was never raised at the administrative level and is being raised for the first time before this Court.   Even now, however, Plaintiff has not pointed to any such particular missing records.   Rather, he asserts only that "[r]ecord evidence is a bit unclear as to the exact degree and amount of support Plaintiff received at his job." ECF No. 9 at p. 2.

ability to perform simple tasks in a competitive work environment."); *see also*, Tr. 114 (Tzetzo opinion, same).   According to Defendant,

> Drs. Bruni and Tzetzo explained that despite his moderate limitations, Plaintiff could understand, remember, and apply simple directions and instructions; sustain concentration and perform a task at a consistent pace; and sustain an ordinary routine and regular attendance at work.

ECF No. 8-1 at p. 7.   Defendant points out that Santarpia similarly opined that Plaintiff could, despite his mental impairments, "understand, remember, and apply simple directions and instructions," "sustain concentration and perform a task at a consistent pace," and "sustain an ordinary routine and regular attendance at work." ECF No. 8-1 at p. 7; Tr. 616.

   The question for the Court is whether the ALJ's RFC finding adequately accounted for Plaintiff's limitations, or whether the ALJ erred by failing to expressly include Plaintiff's moderate limitations, concerning his ability to maintain concentration and a regular work schedule, in the RFC finding.   The Court finds that even assuming *arguendo* that the ALJ erred by failing to expressly include such limitations in the RFC finding or in the hypothetical to the VE, such error was harmless since the medical evidence indicated that even with such moderate limitations Plaintiff could still perform simple unskilled work.   On this point, the Second Circuit has stated:

> We have not specifically decided whether an ALJ's hypothetical question to a vocational expert must account for limitations in concentration, persistence, and pace. But our case law is plain that "the combined effect of a claimant's impairments must be considered in determining disability; the [Commissioner] must evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe." *Dixon*, 54 F.3d at 1031. Accordingly, an ALJ's hypothetical should explicitly incorporate any limitations in concentration, persistence, and pace.

We hold, however, that an ALJ's failure to incorporate non-exertional limitations in a hypothetical (that is otherwise supported by evidence in the record) is harmless error if (1) "medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace," and the challenged hypothetical is limited "to include only unskilled work"; or (2) the hypothetical "otherwise implicitly account[ed] for a claimant's limitations in concentration, persistence, and pace[.]" *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176,1180 (11th Cir. 2011) (collecting cases).

Here, substantial evidence in the record demonstrates that McIntyre can engage in "simple, routine, low stress tasks," notwithstanding her physical limitations and her limitations in concentration, persistence, and pace. By explicitly limiting the hypothetical to such tasks (after fully explaining McIntyre's physical restrictions), the ALJ sufficiently accounted for "the combined effect of [McIntyre's] impairments." *Dixon*, 54 F.3d at 1031. The ALJ's error therefore was harmless.

*McIntyre v. Colvin*, 758 F.3d 146, 151–52 (2d Cir. 2014); *see also, Celia A. B. v. Comm'r of Soc. Sec.*, No. 5:21-CV-112 (CFH), 2022 WL 4225540, at *13, n. 9 (N.D.N.Y. Sept. 13, 2022) ("The Second Circuit has held that an ALJ's failure to incorporate mental limitations into an RFC otherwise supported by substantial evidence is harmless error where (1) medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite' those limitations, and the challenged hypothetical is limited to include only unskilled work; or (2) the hypothetical otherwise implicitly accounted for a claimant's' mental limitations.") (citation and internal quotation marks omitted); *Garcia v. Kijakazi*, No. 21CV1895ERRWL, 2022 WL 3442314, at *20 (S.D.N.Y. Aug. 11, 2022) ("The ALJ's RFC did not expressly address limitations on concentration and persistence. But that was harmless error under *McIntyre* because the ALJ was entitled to find that Garcia could engage in unskilled work based on the record."), *report and recommendation adopted sub nom. Garcia v. Comm'r of Soc. Sec.*, No. 21CIV1895ERRWL, 2022 WL 3903182 (S.D.N.Y. Aug. 30, 2022).

As already discussed, Bruni and Tzetzo indicated that Plaintiff could perform simple, competitive full-time work despite his limitations.   Consequently, the ALJ's failure to specifically include those limitations into the RFC was harmless, since the RFC limited Plaintiff to simple work, and the VE indicated that a claimant with such RFC could perform Plaintiff's past work. Plaintiff's argument for remand on this point is therefore denied.[13]

The ALJ's Alleged Failure to Resolve Conflicts and Develop the Record

Plaintiff next maintains that the ALJ "failed to resolve conflicts regarding the degree of Plaintiff's sheltered work and degree of involvement with his job coach."[14]  Plaintiff maintains that this alleged error was "not harmless," "since the vocational expert indicated that if Plaintiff received job coaching 24 or more minutes [per day], to assist with teaching, focusing and understanding, he would not be capable of competitive employment."[15]

Concerning the supposed "conflict" regarding Plaintiff's receipt of job coaching services, the record is clear that Plaintiff received job coaching once per week while working at Walmart, and that he otherwise had the same working conditions as other employees who did not have impairments:

> Q. And then the job you had getting carts, did you have a job coach or did you have anybody from NYC ARC helping you or coming down as job coach for that?
>
> A. Yes, I did.
>
> Q. Okay.   How often would they come and see you?

---

[13] To the extent Plaintiff goes further and argues that he has "limitations in those areas" that are "arguably even greater than a moderate degree" (ECF No. 7-1 at p. 14), the Court declines to re-weigh the evidence, and finds that the ALJ's RFC finding is supported by substantial evidence.
[14] Pl.'s Mem. of Law, ECF No. 7-1 at p. 12.
[15] Pl.'s Mem. of Law, ECF No. 7-1 at p. 12.

A. It was pretty much the same thing like they would come like once a week to check up on me and stuff.

Q. Okay.   Were you able to do the job of gathering the carts in the same manner that everybody who Walmart hired who was not part of the Resource Center or had a job coach?   Did you do the same kind of work that they did?

A. Yeah.

(Tr. 44).   However, Plaintiff's counsel now asserts that Plaintiff "was noted to have an unrealistic understanding of his limitations *and it is therefore unclear if Plaintiff received job coaching services only on a weekly basis as he noted*." ECF No. 7-1 at p. 16 (emphasis added).

According to Plaintiff's counsel, this alleged ambiguity suggests that Plaintiff's two-year stint at Walmart might not actually have been past relevant work under the Commissioner's rules: "It is unclear whether Plaintiff's past relevant work can truly be classified as past relevant work and not sheltered work, which would call into question whether Plaintiff could perform this work without services and considerations, such as taking breaks when he needed." ECF No. 7-1 at p. 17; *see also, id*. ("The lack of job coaching records is harmful and the ALJ failed in his duty to develop the record regarding whether Plaintiff's work activity falls under the classification of sheltered work.").

Defendant disagrees and asserts that "[s]ubstantial evidence, including Plaintiff's own testimony and the reports of his job coordinators," supports the ALJ's determination that Plaintiff's past work at Walmart was not sheltered employment, and that Plaintiff "lost [that] job due to poor attendance related to stomach issues, not an inability to perform his duties." [16]

---

[16] ECF No. 8-1 at p. 9.

Given the non-adversarial nature of disability hearings, "the ALJ's general duty to develop the administrative record applies even where the applicant is represented by counsel, but the agency is required affirmatively to seek out additional evidence only where there are 'obvious gaps' in the administrative record." *Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 & n. 5 (2d Cir.1999)).

Here, the ALJ questioned Plaintiff about his work at Walmart, and Plaintiff clearly indicated both that his job coach visited him approximately only once per week, and that he otherwise performed the same work, under the same conditions, as the other Walmart employees.   There is no indication that Plaintiff received more than 24 minutes per day of guidance from a job coach while working at Walmart.   Consequently, there was no conflict for the ALJ to resolve about whether the work was "sheltered." Nor was there any obvious gap in the evidence.

The suggestion being raised now by Plaintiff's counsel, that Plaintiff may have testified inaccurately, since someone described him as having "an unrealistic understanding of his limitations," is entirely speculative.   There is no indication in the record that Plaintiff's ability to recall past events or to understand the ALJ's questions was lacking.

In sum, Plaintiff's contention, that the ALJ ignored an obvious conflict and failed to develop the record concerning whether Plaintiff's past work at Walmart may have been sheltered work, lacks merit.

CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No.7) for judgment on the pleadings is denied, and Defendant's cross-motion (ECF No. 8) for the same relief is granted. The Clerk of the Court is directed to enter judgment for Defendant and close this action.

So Ordered.

Dated: Rochester, New York
        March 10, 2023

ENTER:

CHARLES J. SIRAGUSA
United States District Judge

21